IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GRETCHEN M. VALLA,

       Plaintiff,     OPINION AND ORDER

  v.

               3:07-cv-370-bbc

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

   This is an action for judicial review of an adverse decision of the Commissioner of Social Security brought pursuant to 42 U.S.C. § 405(g).  Plaintiff Gretchen Valla seeks reversal of the commissioner's decision that she is not disabled and therefore ineligible for Disability Insurance Benefits under Title II of the Social Security Act, codified at 42 U.S.C. §§ 416(i) and 423(d).  Plaintiff contends that the decision of the administrative law judge who denied her claim is not supported by substantial evidence because the judge made a flawed credibility determination, improperly rejected the opinions of her treating physicians and incorrectly relied on flawed testimony of the vocational expert.

   I find that because the administrative law judge built an accurate and logical bridge between the evidence and his conclusion that plaintiff's complaints of disabling fatigue were

1

not credible, his credibility determination was not patently wrong.  I also find that the administrative law judge properly discounted the opinions of plaintiff's treating physicians because he reasonably determined that the opinions were based largely on her subjective complaints.  Finally, I find that the administrative law judge was entitled to rely on the vocational expert's testimony even though it conflicted with the <u>Dictionary of Occupational Titles</u> because the judge reasonably determined that the expert reached his opinion on the basis of his experience.  Therefore, I am denying plaintiff's motion for summary judgment and affirming the administrative law judge's decision.

The following facts are drawn from the administrative record (AR):

RECORD FACTS

A.  <u>Background and Procedural History</u>

Plaintiff filed an application for Social Security Disability Insurance Benefits on February 27, 2004, alleging that she suffered from thrombocytopenia purpura (a bleeding condition in which the blood fails to clot properly), chronic fatigue and depression.  AR 18, 96.  She has a general equivalency diploma and past work experience as a cashier, restaurant hostess, motel desk clerk, production assembler and material handler.  After the local disability agency denied her application initially and upon reconsideration, plaintiff requested a hearing, which was held on June 30, 2006 before Administrative Law Judge

Roger Thomas in Eau Claire, Wisconsin.  Plaintiff was 42 years old on the date of the hearing, making her a "younger person" for the purposes of her applications for disability benefits.  AR 18; 20 C.F.R. § 404.1563(c).  Plaintiff was represented by counsel.  The administrative law judge heard testimony from plaintiff and from neutral medical expert Dr. Andrew Steiner and neutral vocational expert Paul Maulucci.  AR 18.  On September 12, 2006, the administrative law judge issued his decision, finding plaintiff not disabled.  AR 18-25.  This decision became the final decision of the commissioner on May 30, 2007, when the Appeals Council denied plaintiff's request for review.  AR 6-8.

## B. Medical Evidence

During a November 6, 2003 physical examination, plaintiff complained that she had been having mood swings and night sweats, feeling depressed and anxious and experiencing insomnia over the past few months.  It was noted that plaintiff had petechiae (red or purple spots from broken capillary blood vessels) on her extremities and a platelet count of 15,000, well below a normal level of 150,000 to 450,000.  AR 501.  When plaintiff returned for follow up visits later that month, a physician assistant diagnosed her with depression, anxiety and thrombocytopenia.  The physician assistant prescribed Paxil and a sleep aid and referred plaintiff to Dr. Randolph Hurley, a hematologist, for a bone marrow biopsy.  AR 495-98.

1.    <u>Physical impairments</u>

On December 4, 2003, Hurley noted that plaintiff had diffuse petechiae, easy bruising and heavy menstrual periods.  Plaintiff also reported significant fatigue (sleeping up to 18-20 hours a day) and drenching night sweats.  Tests showed that she was not yet post menopausal and that her platelet count was 20,000.  Hurley was concerned that the night sweats signified an underlying lymphoproliferative disorder (a type of immunodeficiency disorder).  A biopsy performed that day showed hypercellular bone marrow with an atypical clustering of cells and some increased fibrosis, indicating possible myeloproliferative disorder rather than classic immune thrombocytopenic purpura.  Hurley prescribed prednisone, which increased plaintiff's platelet count only temporarily.  AR 198, 398-406, 692, 723.

During February 2004, Hurley gave plaintiff a WinRho injection and prescribed dexamethasone, but both medications increased her platelet count only for a short time.  A second bone marrow biopsy showed no progression of her disease and no new cellular abnormalities.  On March 11, 2004, Hurley wrote that he thought that plaintiff had an underlying myeloproliferative disorder that could not yet be characterized.  Although he considered a splenectomy for plaintiff, Hurley decided not to treat plaintiff unless her platelet count dropped below 20,000, noting that it would not improve her major symptoms of fatigue and night sweats.  By June 2004, plaintiff's platelet count decreased to 23,000 and Hurley referred her to a surgeon, Dr. Neal Melby.  AR 388-93, 398-99, 655-56, 691, 706-10.

Plaintiff saw her primary care physician, Dr. Joel Stoeckeler, several times in July and August 2004.  He noted that she had no bleeding problems, only occasional petechial bruising and no other systemic signs or symptoms.  AR 358-69, 476-89.  Melby removed plaintiff's spleen on September 16, 2004.  Plaintiff's platelet count increased to 200,000 after the surgery but decreased to 57,000 over the following month.  AR 528, 692-94.  Melby wrote in a November 17, 2004 letter to plaintiff's attorney that fatigue and night sweats could affect a person's ability to work and that plaintiff's propensity for bleeding could severely limit her choices of occupations.  However, he stated that he would have to defer to Hurley's and Stoeckeler's judgment regarding the nature of plaintiff's disability.  AR 528.

After her splenectomy, plaintiff continued to see Hurley and Stoeckeler for follow up until mid-2006.  Plaintiff consistently reported significant disabling fatigue during this time period.  On February 23, 2005, Stoeckeler wrote that there did not seem to be any hematologic explanation for her fatigue but stated the opinion that her mild proliferative disorder might be a contributing factor.  Her physicians consistently described her thrombocytopenia and myeloproliferative disorder as stable or mild.  In March 2006, Hurley noted that for the past two years, plaintiff's platelet count had remained in the 40,000 to 60,000 range and she had not needed treatment.  On April 4, 2006, plaintiff saw a neurologist who noted that her fatigue was more likely related to depression, chronic pain

or medications than a systematic inflammatory process.  In May 2006, Stoeckeler examined plaintiff and found no obvious source for her continued fatigue.  AR 595-600, 604-06, 609-13, 623-35, 659-90.

On December 9, 2004, Hurley completed a multiple impairment questionnaire on plaintiff and noted that his findings were based on bone marrow biopsies, blood tests and plaintiff's severe fatigue and bruiseability.  He stated that plaintiff could not work and assessed her with the following limitations:  sit for three hours and stand and walk for less than one hour in an eight hour workday; frequent naps; lift five to ten pounds occasionally; marked limitation in the use of her upper extremities; and low stress work.  Hurley also indicated that plaintiff's pain, fatigue or other symptoms would interfere constantly with her attention and concentration but that emotional factors did not contribute to the severity of her symptoms and functional limitations.  AR 530-36.

On February 23, 2005, Stoeckeler completed a multiple impairments questionnaire on plaintiff and noted that his findings were based on bone marrow biopsies, blood tests and plaintiff's severe fatigue and bruiseability.  He stated that plaintiff could not work and assessed her with the following limitations:  sit for two hours and stand and walk for less than one hour in an eight hour workday; ability to move around every half hour; occasionally lift up to 20 pounds and occasionally carry up to 10 pounds; significant limitations in repetitive reaching, handling, fingering and lifting because of fatigue; moderate limitations

in grasping, turning and twisting objects; marked limitations in fine manipulations with her hands and fingers and overhead reaching; absences of more than three times a month; and low stress work.  Stoeckeler also indicated that plaintiff's pain, fatigue or other symptoms would interfere constantly with her attention and concentration and that her depression, panic attacks and forgetfulness contributed to the severity of her symptoms and functional limitations.  AR 580-87.

In early 2005, plaintiff began experiencing neck and back pain.  Stoeckeler gave plaintiff a skin patch and injections for the pain and referred her to a spine specialist.  Dr. Thomas Rieser examined plaintiff on May 20, 2005.  Plaintiff reported headaches and pain in her neck (primarily the right side), shoulders, arms, middle and lower back, hips and legs. Upon examination, Rieser noted no abnormalities except that plaintiff had global pain with palpation over the cervical, thoracic and lumbar spine areas.  She had a normal gait and full range of motion in the hips, shoulders and cervical spine.  Rieser noted that x-rays showed some degenerative disc disease and anterior spurring in plaintiff's upper thoracic region and very mild changes in her lumbar spine.  Magnetic resonance imaging studies of plaintiff's cervical spine showed degenerative bulging at multiple levels with no herniation or stenosis. Rieser stated the opinion that the mild degenerative changes in plaintiff's spine would account for only a portion of her pain and surmised that her depression and blood disorders

were contributing factors as well.  Rieser noted that he could not offer plaintiff any treatment and ordered further magnetic imaging studies.  AR 613-23.

June 2005 magnetic resonance imaging studies of plaintiff's lumbar spine showed unilevel degenerative disc disease.  After reviewing the studies, Stoeckeler noted that plaintiff had chronic cervical spine changes associated with foraminal stenosis and disc disease.  AR 611-12, 674.  Stoeckeler referred plaintiff to Dr. Heidi Klessig, who evaluated plaintiff's neck pain on July 21, 2005.  Klessig noted that plaintiff's magnetic imaging studies showed mild degenerative changes and observed that plaintiff had full strength and normal reflexes in her upper extremities, full shoulder range of motion and pain with cervical range of motion. Klessig recommended physical therapy and prescribed pain medication.  AR 588-90.

Stoeckeler then referred plaintiff to a pain clinic, where she was treated with pain medications between August 2005 through March 2006.   During an August 2005 examination, a nurse noted that plaintiff had limited range of motion in her neck and a slightly antalgic gait.  In September 2005, plaintiff's gait was within normal limits.  In March 2006, plaintiff had an antalgic gait and full range of motion in her neck.  AR 601-02, 607-08, 646-48.  On March 9, 2006, Hurley noted that plaintiff's reported musculoskeletal pain in her neck, back and hips could relate to her myeloproliferative disorder and depression. AR 659.

2.    <u>Mental impairments</u>

After being diagnosed with depression in 2003, plaintiff was treated with paxil. However, she continued to feel depressed.  Stoeckeler referred plaintiff to Dr. K. Bhaskar Reddy, a psychiatrist, who evaluated her on December 1, 2004.  Plaintiff reported feeling hopeless and depressed, thinking that someone was following her and having three or four anxiety spells a day during which she felt as though she were "out of her body" and in a "dream state."  Reddy noted that plaintiff scored 34 on the Beck Depression Inventory (indicating severe depression) with a lot of vegetative symptoms.  He also noted that plaintiff had exhibited symptoms suggestive of partial complex seizures, including olfactory and gustatory hallucinations, out of body experiences, depersonalization, derealization, severe anxiety, depression, seeing things too far and too close and feeling as though her body and mind were separated.  Reddy diagnosed plaintiff with a mood disorder, wanted to rule out an organic affective disorder and gave her a global assessment of functioning score of 50 (indicating serious symptoms or impairment), <u>see</u> DSM-IV at 34.  AR 564-68.

After speaking with Reddy, Stoeckeler examined plaintiff and noted that plaintiff was alert and oriented.  AR 633-34.    On February 23, 2005, he completed a psychiatric and psychological impairment questionnaire for plaintiff in which he noted that she suffered from depression and anxiety.  He wrote that he had based his diagnoses on plaintiff's poor memory, sleep and mood disturbance, recurrent panic attacks, difficulty thinking and

concentrating and disorientation in time and place.  Stoeckeler also noted that plaintiff had marked limitations in her ability to sustain ordinary routine without supervision, work in coordination with or proximity to others without being distracted, complete a normal workweek without her symptoms causing interruptions, perform at a consistent pace without unreasonable rest breaks, respond appropriately to change and be aware of normal hazards and take precautions.  AR 571-78.

In July 2005, Stoeckeler noted that plaintiff's anxiety had improved.  AR 610.  On December 28, 2005, plaintiff reported sometimes feeling depressed, lacking interest and pleasure in life, and feeling anxious but stated that she was stable and that her antidepressant had been helpful.  AR 598.  On May 3, 2006, Stoeckeler noted that plaintiff's anxiety was stable.  AR 595.

3.    Consulting physicians

On May 25, 2004, Dr. Harlan Heinz, a psychiatrist, examined plaintiff and diagnosed her with panic disorder, major depressive disorder, possible delusional and psychotic disorder and features of a paranoid personality disorder.  He noted that plaintiff had not seen a psychiatrist or therapist.  Plaintiff reported fatigue, lax personal hygiene, hearing voices (including her dead mother's), seeing things out of the corner of her eyes, having homicidal thoughts about a past co-worker and having paranoid thoughts involving co-workers at prior

10

jobs.  Heinz stated the opinion that in a work setting, plaintiff would work at a slow pace and have a fair to poor ability to understand, remember and carry out instructions; fair ability to respond appropriately to supervisors and co-workers; and poor ability to withstand work stress and adapt to change.  AR 177-82.

On June 8, 2004 and December 17, 2004, state agency consulting physicians completed a psychiatric review technique and mental residual capacity assessment on plaintiff and noted that she suffered from major depressive and panic disorders and exhibited features of a paranoid personality disorder.  However, the consulting physicians determined that plaintiff did not have a marked degree of functional limitation in any area.  AR 537-54. State agency consulting physicians also assessed plaintiff's physical residual functional capacity on June 9, 2004 and December 20, 2004, noting that she was limited to sedentary work with the following restrictions:  stand and walk two hours and sit six hours in an eight-hour workday, frequently lift and carry less than 10 pounds and occasionally lift and carry no more than 10 pounds.  AR 555-62.

## C.  Hearing Testimony

Plaintiff testified that she lives with her husband and 17 year old daughter.  She stopped working in September 2003 because she felt ill and tired all of the time.  Plaintiff stated that she has ideopathic thrombocytopenia and myeloproliferative syndrome, which

are not treatable.  She stated that she has had blood transfusions that raised her platelet count only temporarily.  Her last transfusion was on September 16, 2004, and since that time, her platelet count has remained low but stable at 30,000 to 40,000 (the lower her platelet count, the less her blood is able to clot).  Plaintiff testified that she bruises easily, has spontaneous nose and gum bleeding that lasts an hour twice a week and has continuous petechiae in her legs.  She has not received treatment or medication for her nose or gum bleeding.  Plaintiff testified that she sees Hurley once a month and Stoeckeler every two weeks.  Hurley has given plaintiff two bone marrow biopsies and wants to perform another because he feels that she is getting worse.  AR 742, 748-50, 753-55.

Plaintiff testified that her thrombocytopenia and myeloproliferative syndrome cause her to have extreme fatigue, which has worsened since 2003.  She is able to drive only a few blocks and walk half a block.  She explained that two to three times a day, she suddenly falls asleep while sitting or walking and has fallen asleep while eating.  Plaintiff drinks coffee but her physician has not prescribed any medication because it would not help her condition.  She takes three to four-hour naps four or five times a day.  Plaintiff stated that she is able to dress and bathe herself, cook once a week and put dishes in the dishwasher.  She can do these activities for only ten minutes at a time before having to rest for at least 20 minutes.  Plaintiff watches television for about three hours a day and can go grocery shopping for no more than 20 minutes.  Since five or six months prior to the hearing, her husband has had

to do all of the laundry.  Although she has sleep interruptions once a week, plaintiff sleeps from about 10:00 p.m. to 7:30 a.m. each day with the help of medication.  AR 743, 745-47, 752-55, 758-59.

Plaintiff testified that her symptoms of depression include lack of concentration, crying and memory problems.  She cannot read books and can concentrate on a television program for only half an hour at a time.  Plaintiff testified that she does not socialize with family or friends because of her depression and fatigue.  Seeing healthy people around her makes her feel bad.  Once or twice a week, plaintiff is unable to get out of bed to watch television or do chores because of her depression.  She has never been hospitalized for psychiatric reasons.  AR 755-58, 760.

The medical expert, Steiner, testified that fatigue, arthralgia and night sweats are not symptoms of thrombocytopenia and the medical record did not contain any other definitive diagnosis to account for these symptoms.  He stated that myeloproliferative syndrome is generally associated with anemia, recurrent infections or bone pain and deterioration.  He stated that plaintiff's bone marrow biopsy was not helpful in establishing a definitive diagnosis of myeloproliferative syndrome because it showed only that there were more cells than normal and not any cell abnormalities.  He stated that reports of fatigue are very subjective but plaintiff's physicians apparently found her reports credible.  Steiner testified that he saw no evidence in the medical record that plaintiff was experiencing severe bleeding

13

and noted that her thrombocytopenia and myeloproliferative syndrome were described as stable.  To Steiner, it appeared that plaintiff's physicians had surmised that her symptoms might be related to yet undiagnosed conditions.  Steiner stated the opinion that plaintiff could perform work at a sedentary level.  On cross examination, Steiner testified that he is not a psychiatrist and did not analyze the functional limitations of plaintiff's psychiatric disorders.  AR 762-69.

The administrative law judge asked the vocational expert, Maulucci, to consider a person of plaintiff's age, education and work experience who has the residual functional capacity to perform sedentary work.  Maulucci responded that such a person would not be able to perform plaintiff's past work as a cashier, restaurant hostess, motel desk clerk, production assembler and material handler but could perform work as an officer helper or assistant, making copies, collating and taking telephone messages.  He stated that there would be approximately 2,400 unskilled, sedentary jobs in that category in the state of Wisconsin.  Maulucci testified that there also would be approximately 1,000 jobs available as an inspector and 6,000 jobs available as an assembler at the sedentary level within the state.

Maulucci stated that the further restrictions of simple unskilled work without high production goals (for example, not having to keep up with a constant pace) would eliminate the assembly jobs but limitations of no heights, no driving and avoiding hazards would not

14

affect those positions.   On cross-examination, Maulucci testified that no jobs would be available for a person limited to sitting and standing no more than three hours a day and walking no more than one hour a day.   He stated that in his experience, a person limited to simple one or two step instructions could still perform work as an inspector or office helper within Wisconsin.   Maulucci admitted that his testimony could be inconsistent with the Dictionary of Occupational Titles because the Dictionary merely reflects the characteristics of the majority of jobs within a classification and there are variations from region to region and employer to employer.   AR 770-77.

### D.  The Administrative Law Judge's Decision

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step sequential analysis.   See 20 C.F.R. § 404.1520.   The administrative law judge found at step one that plaintiff did not engage in substantial gainful activity since September 16, 2003, her alleged onset date.   At step two, he found that plaintiff is severely impaired by myeloproliferative disorder, thrombocytopenia, obesity, low back pain secondary to one level degenerative disc disease and an adjustment disorder. Relying on the opinion of the medical expert, the administrative law judge found at step three that plaintiff did not have a physical impairment or combination of impairments that

met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1. AR 19-20.

The administrative law judge noted that the record documented the existence of several mental impairments. He evaluated their severity as required under 20 C.F.R. § 404.1520a and concluded that the degree of plaintiff's functional limitations did not meet the section B or C criteria of the listings for mental disorders. 20 C.F.R. 404, Subpart P, Appendix 1, Listing 12.00. The administrative law judge determined that plaintiff had only mild limitations in carrying out daily activities because she was able to independently care for herself and her child, prepare meals, help with dishes, do laundry and grocery shop. He found that plaintiff's restricted social activities caused her to have mild difficulties in maintaining social functioning but noted that plaintiff related appropriately to her medical providers and had no history of altercations, evictions, social isolation or fear of interpersonal relationships. The administrative law judge was persuaded that plaintiff had moderate difficulties maintaining concentration, persistence and pace but noted that she was oriented to time, person and place; able to handle the family finances, wake her child for school, pick up her child from school, attend physician appointments and manage her own medications; and able to recall three out of three items within five minutes during a mental status examination. He determined that plaintiff had not exhibited any repeated episodes of decompensation. AR 19-20.

16

At step four, the administrative law judge assessed plaintiff's residual functional capacity, taking into account plaintiff's subjective complaints regarding her symptoms and limitations, as well as the various medical opinions in the record.  He determined that plaintiff had the residual functional capacity to perform simple, unskilled sedentary work with the following limitations:  lifting up to ten pounds occasionally and five pounds frequently; standing and walking for two hours in an eight-hour workday; sitting six hours in an eight-hour workday; and no high production goals.  In reaching his conclusion, the administrative law judge gave significant weight to the opinions of the neutral medical expert and the state agency consulting physicians.  Although he considered the opinions of plaintiff's treating physicians, Hurley and Stoeckeler, he did not give them controlling weight.  The administrative law judge explained that Hurley's and Stoeckeler's assessments of plaintiff's residual functional capacity were not supported by the medical record and largely based on plaintiff's subjective complaints, which he did not find entirely credible.  AR 21-23.

The administrative law judge found that plaintiff's subjective complaints of pain and total disability were not credible because they were inconsistent with the medical evidence and plaintiff's daily activities; plaintiff is able to control her symptoms with medication; and plaintiff has a sporadic work record and has not demonstrated a strong motivation to return to work.  In support of his conclusions, the administrative law judge noted the following:

17

- The medical expert testified that plaintiff's symptoms of fatigue and night sweats are not characteristic of myeloproliferative syndrome and thrombocytopenia, plaintiff's biopsy findings were nonspecific and her occasional bleeding and bruising were not severe;

- Plaintiff's disc disease and obesity have not resulted in any end organ damage, joint abnormalities, neurological or sensory losses or disturbances in her gait;

- Plaintiff is able to control her depression with antidepressants and has had no need for psychological counseling, psychiatric services or significant medication changes;

- Prescription medication has stabilized plaintiff's physical impairments without side effects;

- Plaintiff routinely cares for herself and her child, gets her child ready for school, picks her child up from school, prepares meals, does the laundry and light housework, grocery shops, uses a computer, pays bills, watches television and helps with the dishes. Although plaintiff alleged that she performed these activities slowly and frequently needed assistance, she was able to stay alone during the day; and

- Plaintiff has had long periods of unemployment, worked for a variety of employers and made no attempt to return to work or seek vocational or rehabilitation training since September 16, 2003.

AR 21-22.

Relying on the testimony of the vocational expert, the administrative law judge found that plaintiff could not perform her past relevant work because it exceeded the limitations of her residual functional capacity assessment. However, he found that the vocational expert's testimony was sufficient to satisfy the commissioner's burden at step five to show

18

that other jobs existed in significant numbers in the national economy that plaintiff could perform, namely office helper and inspector.  AR 23.

OPINION

A.  Standard of Review

The standard by which a federal court reviews a final decision by the commissioner is well settled: the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be.  Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the commissioner.  Edwards v. Sullivan, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, id., and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  Steele v. Barnhart, 290 F.3d 936, 940 (7th

19

Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001).


B.  Credibility Determination

Plaintiff asserts that the administrative law judge improperly rejected her reports regarding the nature and severity of her fatigue.  Under Social Security Ruling 96-7p, an administrative law judge must follow a two-step process in evaluating an individual's own description of his or her impairments:  1) determine whether an "underlying medically determinable physical or mental impairment" could reasonably be expected to produce the individual's pain or other symptoms; and 2) if such a determination is made, evaluate the "intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Social Security Ruling 96-7p, 1996 WL 374186, *1 (1996); see also Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004).  When conducting this evaluation, the administrative law judge may not reject the claimant's statements regarding his symptoms solely on the ground that the statements are not substantiated by objective medical evidence.  Instead, the administrative law judge must consider the entire case record to determine whether the individual's statements are credible.  Relevant factors the administrative law judge must

evaluate are the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; other treatment or measures taken for relief of pain; the individual's prior work record and efforts to work; and any other factors concerning the individual's functional limitations and restrictions.  SSR 96-7p; 20 C.F.R. § 404.1529(c).  See also Scheck, 357 F.3d at 703; Zurawski, 245 F.3d at 887.

An administrative law judge's credibility determination is given special deference because the administrative law judge is in the best position to see and hear the witness and to determine credibility.  Shramek v. Apfel, 226 F.3d 809, 812 (7th Cir. 2000).  In general, an administrative law judge's credibility determination will be upheld unless it is "patently wrong."  Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006); Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying.").  However, the administrative law judge still must build an accurate and logical bridge between the evidence and the result.  Shramek, 226 F.3d at 811.

The administrative law judge stated good reasons for concluding that plaintiff's testimony was not entirely credible.  He cited the testimony of the medical expert that plaintiff's symptoms of fatigue and night sweats are not characteristic of myeloproliferative

21

syndrome and thrombocytopenia, her biopsy findings were nonspecific and her occasional bleeding and bruising were not severe.  Substantial evidence in the record supports the administrative law judge's reliance on the opinion of the medical expert.

Stoeckeler noted in at least two progress notes in 2005 and 2006 that plaintiff's blood disorder was not the source of her continuing reported fatigue.  A neurologist confirmed in April 2006 that it was not likely that her fatigue was caused by a neurological problem. Although plaintiff correctly points out that her platelet count is low, it remained stable for the two years prior to the hearing.  Hurley noted this fact in March 2006 and also wrote that plaintiff had not needed treatment for her bleeding disorder for the past two years.  Further, both Stoeckeler and Hurley consistently described plaintiff's thrombocytopenia and myeloproliferative disorder as stable and mild between 2004 and 2006.

Plaintiff argues that her depression clearly contributes to the severity of her fatigue. However, at the hearing, plaintiff attributed her fatigue to her physical impairments and not her depression.  Further, even if plaintiff's depression exacerbates her fatigue, plaintiff does not cite any evidence about her depression that the administrative law judge failed to consider.  In fact, the administrative law judge considered plaintiff's depression and found that she was able to control it with antidepressants and has had no need for psychological counseling, psychiatric services or significant medication changes.  A review of the medical record shows that his conclusions are well-founded.  In July 2005, Stoeckeler noted that

22

plaintiff's anxiety had improved, and in December 2005, plaintiff reported that she was stable and her antidepressant had been helpful.  By May 2006, Stoeckeler noted that plaintiff's anxiety was stable.

Proof of disability is difficult to establish in cases like this one in which the claimant reports symptoms that have not been verified by medical experts.  Sims, 442 F.3d at 537. "In such a case, the administrative law judge must of necessity base [his] decision on the credibility of the claimant's testimony."  Id. at 537-38.  The administrative law judge was entitled to view the lack of medical evidence supporting plaintiff's subjective complaints of severe fatigue as a factor probative of her credibility.  Powers v. Apfel, 207 F.3d 431, 435-36 (7th Cir. 2000) (upholding administrative law judge's determination in fibromyalgia case that plaintiff's credibility was undermined by discrepancy between degree of pain claimed and that suggested by medical evidence).  However, it can't be the *only* factor.  SSR 96-7p.

In addition to the medical evidence, the administrative law judge also considered other relevant factors listed in SSR 96-7p.  He noted that plaintiff routinely cares for herself and her child, gets her child ready for school, picks up her child from school, prepares meals, does light housework, grocery shops, uses a computer, pays bills, watches television and helps with the dishes.  Plaintiff asserts that the administrative law judge gave too much weight to her daily activities, which she argues are sporadic and minimal.  However, there is no indication that the administrative law judge failed to take into consideration the limited

23

extent that plaintiff engages in her daily activities.  He specifically noted that although plaintiff performed her activities slowly and frequently needed assistance, she was able to stay alone during the day.  Plaintiff's performance of the above activities, even for a limited period, is still evidence that her alleged symptoms are not as severe as she claims and that she is capable of performing sedentary work.

The administrative law judge also determined that plaintiff had a poor work record and did not demonstrate a strong motivation to return to work.  In support, he cited her sporadic employment for a variety of employers, long periods of unemployment and lack of attempts to return to work or seek vocational or rehabilitation training after September 2003.  Plaintiff faults the administrative law judge for not considering how long and to what extent she suffered from her impairments, suggesting that her impairments contributed to her sporadic work record even prior to her alleged onset date.  However, as defendant points out, plaintiff provides no evidence to support this assertion.  The medical record establishes only that plaintiff exhibited symptoms beginning in November 2003.

Plaintiff also argues that if she had made attempts to return to work, it is likely that the administrative law judge would have interpreted this to mean that she was not disabled.  An administrative law judge is instructed to consider a claimant's work record in making a credibility determination.  SSR 96-7p; Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998).  Further, nothing in the social security regulations or policy interpretations suggests that an

24

administrative law judge may consider only favorable work history in weighing credibility.

Id.  A claimant's prior work history can support one of two conclusions:

> On the one hand, just as a good work history may be deemed probative of credibility, a poor work history can reasonably be deemed to have the opposite significance.  However, a poor work history might also support an inference that a claimant's testimony of disability is truthful.  A claimant's failure to work might stem from her inability to work as easily as her unwillingness to work. . . . An ALJ should explore a claimant's poor work history to determine whether her absence from the workplace cannot be explained adequately (making appropriate a negative inference), or whether her absence is consistent with her claim of disability.

Schaal, 134 F.3d at 502.

The administrative law judge's conclusion that plaintiff's poor work record could not be adequately explained is reasonable and based on substantial evidence.  Apart from general allegations, plaintiff has not come forth with any evidence to show that her sporadic work history resulted solely from her impairments.  Plaintiff also has not pointed to any evidence that the administrative law judge failed to consider or that suggests bias on his part.  See Sarchet v. Chater, 78 F.3d 305, 308 (7th Cir. 1996) (administrative law judge erred in discounting claimant's credibility based on work history where he failed to consider claimant's minimal education, long list of medical ailments and numerous medications).  In any event, work history is just one of many factors that the administrative law judge must consider in weighing credibility.  Therefore, even if the administrative law judge erred in drawing a negative inference from plaintiff's poor work record, that error would be harmless.

25

The administrative law judge could have viewed the above evidence regarding plaintiff's credibility in a different light.  However, the court's reviewing authority does not extend to deciding whether the administrative law judge reached the "best" decision or the one that the court might have reached; it is limited to deciding whether the decision he did make is supported by substantial evidence.  Because the administrative law judge's credibility determination was not patently wrong and is supported by the evidence, there is no basis for remand.

The administrative law judge considered not only the objective medical evidence but other relevant SSR 96-7p factors, including plaintiff's daily activities, other treatment and measures taken to relieve her symptoms and functional limitations and restrictions.  Even if the administrative law judge technically erred by failing to address all of the SSR 96-7p factors, this error was harmless.

Plaintiff has not demonstrated that this is one of those rare occasions on which the court should disturb the administrative law judge's credibility finding.  The administrative law judge was not patently wrong.  He built an accurate and logical bridge between the evidence and his conclusion that plaintiff's allegation of disabling fatigue was not persuasive.  It is possible that a different fact finder might have reached a different conclusion, but this possibility is not a basis for setting aside the administrative law judge's credibility determination.

26

C.  Treating Physicians' Opinions

Plaintiff contends that the administrative law judge erred in rejecting the opinions of her treating and examining physicians by failing to give them appropriate weight under 20 C.F.R. § 404.1527(d)(2) and Social Security Ruling 96-2p.  Although an administrative law judge must consider all medical opinions of record, he is not bound by those opinions. Haynes v. Barnhart, 416 F.3d 621, 630 (7th Cir. 2005).  "[T]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances."  Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006).  When a treating physician's opinion is well supported and no evidence exists to contradict it, the administrative law judge has no basis on which to refuse to accept the opinion.  Id.; 20 C.F.R. § 404.1527(d)(2).  When, however, the record contains well-supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the administrative law judge to weigh," taking into consideration the various factors listed in the regulation.  Id.  These factors include how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, how consistent the physician's opinion is with the evidence as a whole, and other factors.  20 C.F.R. § 404.1527(d)(2).  An administrative law judge must provide "good reasons" for the weight he gives a treating source opinion.  Id.  He also must base his decision on substantial evidence and not mere speculation.  White v. Apfel, 167 F.3d 369, 375 (7th Cir. 1999).  The final decision about whether plaintiff is

27

disabled is a legal one to be made by the administrative law judge, and the administrative law judge's reasonable resolution of conflicts in the medical evidence is not subject to review. Kapusta v. Sullivan, 900 F.2d 94, 97 (7th Cir. 1989); see also Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1989) (determination of claimant's limitations is decision reserved to Social Security Administration, which must consider entire record and not only physicians' opinions).

The administrative law judge did not find the opinions of Hurley and Stoeckeler persuasive because the limitations they assessed were not well-supported by the medical record and were largely based on plaintiff's subjective complaints, which he did not find entirely credible.  Plaintiff finds fault with this reasoning, arguing that Hurley is a specialist in hematology and that he and Stoeckeler regularly treated her for a number of years.  She argues generally that her diagnostic clinical and laboratory tests, trial medications and splenectomy support the limitations assessed by Hurley and Stoeckeler.

There is no indication that the administrative law judge failed to consider Hurley's expertise or the extent to which Hurley and Stoeckeler treated plaintiff.  He referred to their treatment notes and discussed their diagnoses and opinions, indicating that he had thoroughly reviewed the record.  The administrative law judge determined that although Hurley's and Stoeckeler's clinical findings, tests and treatment supported their diagnoses,

28

they did not substantiate the alleged severity of plaintiff's impairments or limitations.  This finding is well-founded.

Plaintiff's chief complaint is severe fatigue.  Relying on her reports, Hurley and Stoeckeler assessed plaintiff with strict limitations regarding sitting, walking, standing, lifting and using her hands and upper extremities.  However, as discussed in the previous section, evidence of her fatigue was based almost exclusively on her subjective complaints.  Plaintiff's physicians could not identify the source of plaintiff's fatigue or otherwise explain it medically.  Although plaintiff disagrees, she does not cite any specific evidence in support of her contention apart from general references to her tests, trial medications and surgery.  In the absence of such evidence, the administrative law judge was reasonable in concluding that Hurley's and Stoeckeler's opinions were based on plaintiff's subjective complaints.

It is well settled that an administrative law judge may properly disregard a medical opinion when it is premised on the claimant's self-reported symptoms and the administrative law judge has reasons to doubt the claimant's credibility.  See, e.g., Diaz, 55 F.3d at 307 (administrative law judge could properly reject portion of physician's report based upon plaintiff's own statements of functional restrictions where administrative law judge properly found plaintiff's subjective statements not credible); Mastro v. Apfel, 270 F.3d 171, 177-78 (4th Cir. 2001) (affirming administrative law judge's disregard of treating physician's opinion because opinion "was based largely upon the claimant's self-reported symptoms" and was not

29

supported by objective medical evidence); <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 602 (9th Cir. 1999) (physician's opinion of disability premised to large extent upon claimant's own accounts of symptoms and limitations may be disregarded where those complaints have been properly discounted).   Because the administrative law judge properly rejected plaintiff's subjective statements, <u>see</u> section B above, it follows that he could properly reject the medical opinions to the extent that they were based upon those statements.

Plaintiff criticizes the administrative law judge for incorrectly stating that her disc disease and obesity did not result in any gait disturbances.  She argues without explanation that the fact that she had an antalgic gait supports the limitations assessed by Hurley and Stoeckeler.  However, the only mention of plaintiff having a gait disturbance was by a pain clinic nurse in August 2005 and March 2006, well after Hurley and Stoeckeler rendered their opinions.  It is not clear how plaintiff's antalgic gait supports the limitations assessed by her treating physicians given that they based their opinions almost solely on her reported fatigue.  Nothing in the record indicates that an antalgic gait would have any effect on plaintiff's residual functional capacity.  Even assuming that it could affect her ability to walk, the administrative law judge found plaintiff capable of only sedentary work.  Therefore, any error that the administrative law judge may have made in interpreting the medical record was harmless.

Plaintiff also criticizes the administrative law judge for finding that the record did not support her treating physicians' opinions because it did not document marked limitations in her concentration, persistence or pace.  In support, she cites 1) the opinion of Heinz that she would have a slow work pace and a poor ability to understand, remember and carry out instructions and 2) Reddy's diagnoses and assignment of a global assessment of functioning score of 50.  However, the administrative law judge considered this evidence and was persuaded that plaintiff had moderate difficulties in maintaining concentration, persistence or pace.  He noted that the medical record showed that she was oriented to time, person and place; able to handle the family finances, wake her child for school, pick up her child from school, attend physician appointments and manage her own medications; and able to recall three out of three items within five minutes during a mental status examination.  These findings are supported by substantial evidence and suggest that plaintiff was able to maintain concentration, persistence and pace on a daily basis.  Therefore, it was reasonable for the administrative law judge to conclude that plaintiff did not have marked limitations in these areas.   Further, the administrative law judge accounted for plaintiff's difficulty in maintaining concentration, persistence or pace by limiting her to simple, unskilled work without high production goals.

Although plaintiff criticizes several statements made by the administrative law judge, she has not come forth with substantial medical evidence that the administrative law judge

31

failed to consider.  The administrative law judge appropriately considered and weighed the limitations assessed by plaintiff's treating and examining physicians and rejected them for good reasons that are supported by substantial evidence in the record.

### D.  Vocational Expert Testimony

Plaintiff asserts that in making his step five determination, the administrative law judge erroneously relied on the vocational expert's testimony that plaintiff could perform the jobs of office helper and inspection work.  Plaintiff points out that in the Dictionary of Occupational Titles, inspection work represents a broad category of occupations instead of a specific job and office helper is classified as light and not sedentary work.

At step five of the sequential evaluation process, the burden shifts to the commissioner to show that despite the severe impairment, the claimant is able to perform other work "which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country."  Stevenson v. Chater, 105 F.3d 1151, 1154 (7th Cir. 1997); 42 U.S.C. § 423(d)(2)(A).  This burden-shifting to the commissioner is not statutory, "but is a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n. 3 (7th Cir. 1987).  The court must uphold the commissioner's finding regarding the existence of other work if the finding is supported by substantial

evidence, that is, if reasonable minds would find the evidence adequate to support the conclusion.  42 U.S.C. § 405(g); <u>Richardson</u>, 402 U.S. at 401.

Social Security Ruling 00-4p explains that the commissioner can rely on information contained in the <u>Dictionary of Occupational Titles</u> published by the Department of Labor to meet his burden of showing that a claimant unable to perform her past work can make a vocational adjustment to other work existing in significant numbers.  The Social Security Administration has taken "administrative notice" of the <u>Dictionary</u>, which contains detailed physical requirements for a variety of jobs.  20 C.F.R. § 404.1566(d)(1).  Alternatively, the commissioner may rely on information provided by a vocational expert.  SSR 00-4p. However, an administrative law judge who takes testimony from a vocational expert about the requirements of a particular job must determine whether that testimony is consistent with the <u>Dictionary</u>.  <u>Prochaska</u>, 454 F.3d at 735.  The ruling states:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:
>
> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p.

The ruling explains that because the <u>Dictionary</u> "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings," a vocational expert may be able to provide more specific information about jobs than that provided by the <u>Dictionary</u>.  <u>Id</u>.  "Information about a particular job's requirement or about occupations not listed in the DOT may be available in other reliable publications, information obtained directly from employers, or from a [vocational expert's] experience in job placement or career counseling."  <u>Id</u>.  When there is a conflict between the vocational expert's testimony and the <u>Dictionary</u>, the administrative law judge is free to rely on the vocational expert's testimony so long as the administrative law judge determines that "the explanation given by the [vocational expert] is reasonable and provide[s] a basis for relying on [that] testimony rather than on the DOT information."  <u>Id</u>.  In this case, the vocational expert acknowledged that his testimony regarding plaintiff's ability to perform the occupations of office helper and inspector might be inconsistent with the <u>Dictionary</u>, which lists those occupations as light and not sedentary.  He indicated, however, that he was aware from his experience that sedentary jobs in each occupation existed in the state of Wisconsin.

Plaintiff raises two objections to the administrative law judge's decision to accept this testimony.  First, she asserts that "if a vocational expert is consulted and the claimant found not disabled, the ALJ's determination must include '(1) citations of examples of

occupations/jobs the person can do functionally and vocationally and (2) a statement of the incidence of such work in the region in which the individual resides . . .'" Haynes v. Barnhart, 416 F.3d 621, 629 (7th Cir. 2005) (quoting Social Security Ruling 83-14). The administrative law judge appropriately posed a series of hypothetical questions to Maulucci, incorporating plaintiff's limitations that were substantially supported by the record. Maulucci made clear in his response that plaintiff was capable of performing approximately 1,000 basic inspection jobs. Even though inspection work includes more than one job title in the Dictionary, Maulucci's testimony provided a sufficient basis from which the administrative law judge could reasonably conclude that plaintiff could perform work in a significant number of jobs in the regional economy. See id. at 629-30 (holding same where vocational expert rendered opinion after administrative law judge posed hypothetical supported by record).

I also disagree with plaintiff's second objection that the administrative law judge was precluded from finding that jobs listed in the Dictionary calling for a light level of exertion could actually be performed at the sedentary level. In support of her argument, plaintiff cites Tom v. Heckler, 779 F.2d 1250, 1255-56 (7th Cir. 1985) and Young v. Secretary of health and Human Services, 957 F.2d 386 (7th Cir. 1992), which summarized the holding in Tom. In Tom, the court reversed the commissioner in part because the adjudicator relied on vocational expert testimony that did not match the Dictionary, but I do not find the holding

35

persuasive in the instant case.  In that case, the vocational expert testified that the claimant had acquired skills from past work that were transferrable and identified four jobs that the claimant could perform.  <u>Tom</u>, 779 F.2d at 1255.  As in this case, the <u>Dictionary</u> listed those particular jobs as requiring a higher exertional level than the claimant was found able to perform.  <u>Id.</u>  The court of appeals reversed and remanded, noting that the administrative law judge never found explicitly that the four jobs listed by the vocational expert could be performed at a lower exertional level.  <u>Id.</u> at 1255-56.  Instead, the adjudicator had found only that the claimant's skills could be transferred to the four jobs.  <u>Id.</u>  Unlike in <u>Tom</u>, the vocational expert in the instant case made clear that in his experience, sufficient numbers of jobs existed in the categories of office helper and inspector that could be performed at plaintiff's exertional level (sedentary), even if the <u>Dictionary</u> listed the majority of those jobs as being at a light exertional level.

Under Social Security Ruling 00-4p, "if all available evidence (including VE testimony) establishes that the exertional demands of an occupation meet the regulatory definition of 'medium' work  . . . the adjudicator may not rely on VE testimony that the occupation is 'light' work."  SSR 00-4p.  However,  even though regulatory definitions of exertional levels are controlling, "there may be a reason for classifying the exertional demands of an occupation (as generally performed) differently than the DOT (e.g. based on other reliable occupational information)."  <u>Id</u>.  In this case, the vocational expert's testimony

36

falls under this permissible scenario.  Maulucci did not testify that a hypothetical person with the proposed limitations could perform light work; rather, he testified that a subset of the jobs classified in the <u>Dictionary</u> as "light" could actually be performed at the sedentary level.

It is plain from the hearing transcript and resulting decision that the administrative law judge accepted as reasonable the vocational expert's explanation that his opinion was based on his experience.  To the extent that plaintiff is arguing that the expert's experience was not a good reason for accepting his testimony over the <u>Dictionary</u>, I disagree.  Maulucci's testimony, combined with his qualifications and experience, provided a reasonable basis for the administrative law judge to rely on it over the <u>Dictionary</u> with regard to the requirements of the various jobs Maulucci identified.

Although experts testifying at administrative hearings should use reliable methods in forming their opinions, a vocational expert is "free to give a bottom line, provided that the underlying data and reasoning are available on demand."  <u>Donahue v. Barnhart</u>, 279 F.3d 441, 446 (7th Cir. 2002).  After being presented with plaintiff's abilities and limitations at the hearing, Maulucci produced some job titles and numbers.  <u>Id.</u>  At this point, plaintiff (through her attorney) could have cross-examined him about where these numbers came from.  <u>Id.</u>  Although plaintiff's attorney asked Maulucci whether his testimony could be inconsistent with the <u>Dictionary</u>, he did not ask the vocational expert about the genesis of

37

the numbers.  Id.; contra McKinnie v. Barnhart, 368 F.3d 907, 911 (7th Cir. 2004) (finding remand appropriate where plaintiff challenged foundation of expert's testimony and reliability of his conclusions).  "When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the Dictionary's — for the Dictionary, after all, just records other unexplained conclusions and is not even subject to cross-examination."  Accordingly, the administrative law judge was entitled to rely on Maulucci's expert testimony.


ORDER

IT IS ORDERED that the decision of defendant Michael Astrue, Commissioner of Social Security, is AFFIRMED and plaintiff Gretchen Valla's appeal is DISMISSED.  The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 8th day of February, 2008.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge